UNITED STATES of America, Plaintiff,

v.

**Mary Frances CARRIER, Defendant.**

**No. 81–CR–70.**

United States District Court,
N. D. New York.

July 7, 1981.

George Lowe, U. S. Atty., Syracuse, N. Y., for plaintiff; John J. McCann, Asst. U. S. Atty., Syracuse, of counsel.

Ronald R. Benjamin, Binghamton, N. Y., for defendant.

MUNSON, Chief Judge.

### MEMORANDUM–DECISION AND ORDER

Presently before the Court is a motion by the defendant Mary Frances Carrier to dismiss an indictment charging her on two counts with violating 18 U.S.C. § 871. In brief, this provision makes it a crime to threaten the life of the President of the United States, or the successors to that Office. The indictment in question, which was returned by a Grand Jury sitting in the Northern District of New York on July 1, 1981, charged the defendant with making two separate verbal threats on April 7th and 9th, 1981 against the President. More specifically, both counts of the indictment were prefaced by the following language: "in the presence of Kevin M. Mitchell and John LaVergne [the defendant] willfully and knowingly did make an oral threat to take the life of, and to inflict bodily harm upon, the President of the United States, in the verbal use of threatening language, substantially as follows . . . ." After stating these prefatory remarks, each count of the indictment quoted the words that were allegedly used by the defendant in accomplishing the threats. In the first count, the defendant is supposed to have said "I know why you're here. The President should be murdered. Yeah, I threatened the President." The second count states that the defendant also said: "It's too bad that Hinckley wasn't successful in killing that son of a bitch... The only thing I will do is blow the head off the President of the United States." Before the Court considers the merits of the defendant's motion, the legal principles applicable to the matter at hand will first be addressed.

Pursuant to Rule 7(c)(1) of the Federal Rules of Criminal Procedure, "The indict-

ment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. . . . It need not contain a formal commencement, a formal conclusion or any other matter not necessary to such statement." The Supreme Court has interpreted this provision in the following manner:

Our prior cases indicate than an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hagner v. United States*, 285 U.S. 427 [52 S.Ct. 417, 76 L.Ed. 861] (1932); *United States v. Debrow*, 346 U.S. 374 [74 S.Ct. 113, 98 L.Ed. 92] (1953). It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Carll*, 105 U.S. 611, 612 [26 L.Ed. 1135] (1882). "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *United States v. Hess*, 124 U.S. 483, 487, 8 S.Ct. 571, 573, 31 L.Ed. 516 (1888).

*Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974); *accord United States v. Bailey*, 444 U.S. 394, 414, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980); *see also Russell v. United States*, 369 U.S. 749, 764–66, 82 S.Ct. 1038, 1047–48, 8 L.Ed.2d 240 (1962). The "corollary purpose" served by requiring that indictments be reasonably specific in stating the offense charged—a purpose that is often overlooked—is " 'to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had.' "

*Russell v. United States*, 369 U.S. 749, 768 and n. 15, 82 S.Ct. 1038, 1049, 8 L.Ed.2d 240 (1962). *Citing United States v. Cruickshank*, 92 U.S. 542, 558, 23 L.Ed. 588 (1875).

In *Russell v. United States* the Supreme Court expanded upon the "essential elements" test. The facts in *Russell* involved six separate indictments under 2 U.S.C. § 192, which makes it a crime to refuse to answer certain questions when summoned before a congressional committee. Each of the defendants had moved to dismiss their indictments before trial on the ground that the indictment failed to state the subject under investigation by the committee when it interrogated the defendant. The subject matter of the congressional inquiry was a factor that was not reflected in the language of Section 192. Nevertheless, the Court concluded that the subject matter element of Section 192 was an essential element of the criminal charge, and that it must be included in an indictment under that statutory provision. In examining the terms of Section 192, the Court held that "there can be criminality under the statute only if the question which the witness refused to answer pertained to a subject then under investigation by the congressional body which summoned him." 369 U.S. at 755, 82 S.Ct. at 1041, citing *Sinclair v. United States*, 279 U.S. 263, 292, 49 S.Ct. 268, 271, 73 L.Ed. 692 (1929).

As a second factor militating in favor of requiring the subject matter element to be pleaded by the government, the Court observed that the government was required to prove up this element as part of its burden of proof under Section 192. *Id.* In addition, the Supreme Court found that the subject matter should be included in the indictment because the "pertinency" of the congressional inquiry was to be determined by a court as a matter of law. *Id.* 369 U.S. at 755–56, 82 S.Ct. at 1041–42. The Court noted that the legislative history of Section 192 supported these conclusions, as did an analysis of the constitutional purpose of a grand jury indictment, which, inter alia, is to ensure that "the accused shall enjoy the right . . . . to be informed of the nature and

cause of the accusation; . . . ." U.S.Const. amend. VI. *Id.* at 756–61, 82 S.Ct. at 1043–45. And finally, the Court held that basic principles of fairness and a proper reading of Rule 7(c) compelled the conclusion that subject matter was an essential element of an indictment under Section 192. *Id.* at 762–66, 82 S.Ct. at 1046–48. Citing *United States v. Cruikshank,* 92 U.S. 542, 558, 23 L.Ed. 588 (1875) ("It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms in the definition; but it must state the species—it must descend to particulars.' ").

The statute in question in the instant inquiry is 18 U.S.C. § 871, which states in pertinent part:

Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1000 or imprisoned not more than five years, or both.

While the Supreme Court has yet to rule on the precise meanings of the terms "knowingly and willfully," in *Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (per curiam), the Court defined the outer bounds of a "threat" for purposes of Section 871. In *Watts* the petitioner had been convicted under Section 871 for statements he had made during a discussion session held at a public rally against policy brutality. After one member of the discussion group mentioned that the young people present should be better educated before expressing their views, the petitioner responded:

"They always holler at us to get an education, and now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." "They are not going to make me kill my black brothers."

394 U.S. at 706, 89 S.Ct. at 1400.

The Court held that "a statute such as [Section 871], which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Id.* at p. 707, 89 S.Ct. at p. 1401. In the Court's view, petitioner Watt's statement was nothing more than "political hyperbole." *Id.* at p. 708, 89 S.Ct. at p. 1401. The Court continued as follows:

For we must interpret the language Congress chose "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 [84 S.Ct. 710, 720, 11 L.Ed.2d 686] (1964). The language of the political arena, like the language used in labor disputes, *see Linn v. United Plant Guard Workers of America,* 383 U.S. 53, 58 [86 S.Ct. 657, 660, 15 L.Ed.2d 582] (1966), is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was "a kind of very crude offensive method of stating a political opposition to the President." *Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise.*

*Id.* (emphasis supplied).

 The lesson of *Watts* is that there can be no criminal threat under Section 871

on the basis of words alone. To the contrary, it is the words when taken in their spoken context, the unconditional nature of the statement, and the reaction of the listener, which form the basis of an offence under the statute. As such, the context element of Section 871 is essential and must be included in a properly drawn indictment under said provision. This conclusion is necessitated by the same rationale employed by the Supreme Court in both *Russell* and *Hamling*. As just mentioned, the allegedly threatening context within which words are spoken is the underlying criminal activity punishable by Section 871. The government, moreover, has the burden of proving that the particular context in which words are spoken is a threat under Section 871. Furthermore, as the Court found in *Russell* with regard to the pertinency of the subject matter of a congressional inquiry under 2 U.S.C. § 192, fundamental constitutional principles are also implicated by the threatening context question. An indictment which describes allegedly threatening words alone, but omits a description of the context within which those words are spoken, is violative of the Sixth Amendment's requirement that every accused has the right "to be informed of the nature and cause of the accusation; ..."

At the same time, the spoken context is also essential in order to make certain that a statute such as Section 871, which "makes criminal a form of pure speech ... [is] interpreted with the commands of the First Amendment clearly in mind." In other words, the First Amendment was designed to protect "uninhibited, robust and wide-open" debate. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). "The constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered.' *N.A.A.C.P. v. Button*, 371 U.S. 415, 445 [83 S.Ct. 328, 344, 9 L.Ed.2d 405]." *Id.* at p. 271, 84 S.Ct. at p. 721. Thus, speech which may appear to a listener as having little social utility or intention beyond attempting to attract attention to the speaker, is nonetheless protected speech under the Constitution. Yet if spo-

ken in a particular context, that same speech might as well amount to a threat that is prohibited under Section 871. The only way to separate protected speech under the First Amendment from unprotected speech is to examine the context within which that speech is uttered. For this reason, it is essential that a properly drawn indictment under Section 871 include some mention of the spoken context of words which the government believes to be threatening within the meaning of that statute.

This same conclusion is consistent with the legislative intent of Section 871 and the purpose of Rule 7(c). According to Justice Marshall in his concurring opinion in *Rogers v. United States*, 422 U.S. 35, 46, 95 S.Ct. 2091, 2098, 45 L.Ed.2d 1 (1975), "[t]he sponsors [of Section 871] thus rather plainly intended the bill to require a showing that the defendant appreciated the threatening nature of his statement and intended at least to convey the impression that the threat was a serious one." Seemingly threatening words spoken "innocently" or without thought of the serious nature of their import were not intended by Congress to be punishable under Section 871. *Id.* at pp. 45–6, 95 S.Ct. at 2097–2098. It is therefore crucial that the context in which allegedly threatening words were spoken be included in an indictment under Section 871 to enable a court as a matter of law to discern those situations where apparent threats are made from others in which the threats are indeed real. This result is also indicated by the requirements of Rule 7(c). Pursuant to Rule 7(c) an indictment must state "the essential facts constituting the offense charged." In view of this Court's previous discussion of the significance of the spoken context element of an offence under Section 871, it suffices to say at this juncture that a description of an allegedly threatening context is both essential and necessary to a properly drawn indictment under this statute. Moreover, even a casual reading of Section 871 reveals that its terms are quite uncertain and ambiguous. As a consequence, to properly apprise a defendant of the offence charged, it is nec-

essary that an indictment include a description of "the facts and circumstances" stating the context within which an apparent threat was made. *See Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974); *accord Russell v. United States*, 369 U.S. 749, 764–65, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962).

■ In the present case the government has made virtually no effort to include a description of the context or the "facts and circumstances" underlying the statements allegedly made by the defendant as reflected in Counts I and II of the instant indictment. The only factual references in the indictment to the supposed threats made by the defendant against the President is confined solely to the words assertedly uttered by the defendant. Significantly absent from the indictment is even a hint as to the context within which those words were spoken. For instance, it is impossible to ascertain from the indictment whether these words were uttered at a cocktail party in the course of relating some sort of perverted joke; or if the words were spoken in the middle of a heated debate on the merits of pending federal budget cuts. Actually, the defendant has been presented with an indictment that is for all practical purposes infinite in terms of its contextual possibilities. Minimal standards of criminal pleading require far more. In sum, the two count indictment of the defendant for violating 18 U.S.C. § 871 must be dismissed for the government's failure to include the essential requisite element of the contextual "facts and circumstances" underlying the allegedly threatening statements made by the defendant.

However, the Court's inquiry does not end here. The Court's "corollary" responsibilities in considering the merits of a motion to dismiss an indictment permit it to determine whether the facts asserted in the instant indictment would support the defendant's conviction under 18 U.S.C. § 871 as a matter of law. *See Russell v. United States*, 369 U.S. 749, 768, 82 S.Ct. 1038, 1049, 8 L.Ed.2d 240 (1962). It can only be reasonably concluded here that they would

not. As a primary matter the Court cannot help but observe that the instant indictment fails to accurately describe the defendant's allegedly threatening remarks as overheard by the arresting officer, Secret Service Agent Kevin Mitchell. In his sworn affidavit, Agent Mitchell states that he overheard the defendant · state as follows: "Yeah, yeah, I know why you're here. I threatened the President. The President should be murdered." In contrast, and as described already in this opinion, Count I of the indictment reports that the defendant stated "I know why you're here. The President should be murdered. Yeah, I threatened the President." This latter statement is qualified in the indictment as being a "substantially" accurate quotation. Since in his sworn affidavit Agent Mitchell did not in any way qualify the accuracy of his recollection of the defendant's statement it is both perplexing and disturbing to this Court that the government chose to qualify Agent Mitchell's recollection for him. Perhaps even more startling about the government's conduct is that this "inaccuracy" has occurred in the context of a criminal speech case where the accuracy of a quoted phrase can mean the difference between a speaker receiving the protection of the First Amendment or the hospitality of a jail cell. Whether or not this discrepancy was made through inadvertence or intentionally, it demonstrates an intolerably callous attitude by the government towards this defendant's Constitutional rights. A more detailed examination of the "facts and circumstances" surrounding the defendant's arrest is in order.

■ Stated briefly, in the course of investigating purported threats against the President of the United States, on April 7, 1981 Agent Mitchell allegedly overheard the defendant state: "Yeah, yeah I know why you're here. I threatened the President. The President should be murdered." The defendant was arrested on the basis of this statement. After her arraignment, on April 9, 1981 Agent Mitchell allegedly overheard the defendant further remark in substance: "It's too bad that Hinckley wasn't

successful in killing that son of a bitch. . . . The only thing I will do is blow the head off the President of the United States." Both of these statements form the basis of separate counts of a two count indictment filed against the defendant on July 1, 1981. As a matter of law, these statements, whether construed separately or together, do not amount to a serious threat against the President of the United States. The language quoted in Count I of the indictment for the most part refers to some unspecified previous occasion of which the defendant apparently believes she threatened the President. That the events or occasion leading her to believe that she had threatened the President are not described by the indictment, tends to indicate that they in fact were not a serious threat to the President, or such additional statements would presumably have been included in the indictment to lend further factual credence to Count I or made into a separate count. A fortiori words used to subsequently describe this "non-event" could not rise to the level of being a serious threat against the life of the President. The remaining phrase, "The President should be murdered," is sufficiently vague to support a variety of interpretations, many of which are entirely harmless. For example, the statement can reasonably be viewed as a simple statement of rebellion. It can also be construed as an expression of the defendant's desire that someone else besides the defendant should murder the President. As such, the Court is hard pressed from viewing this statement in this context as anything more than "vituperative, abusive, and inexact." *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969).

This manner of behavior in no fashion resembles the type of behavior other courts have dealt with in prosecutions under Section 871. In one case, defendant's conviction under Section 871 has been upheld where the defendant expressed in an unconditional, serious and deliberate tone in effect the statement that "I will have to kill the President," and made this statement in the context of a long and rambling colloquy with a police officer; which included a variety of other such statements reaffirming the initial threat and specifying a weapon that would be used to carry out the threat. *See United States v. Frederickson*, 601 F.2d 1358 (8th Cir. 1979). Neither is the present case similar to the instance where a defendant repeatedly called the police department saying that he was going to kill the President because in effect he "couldn't stand him," that God told him to do so, and that he had a gun which he was going to use. On the previous day, the very defendant was found in the same hotel of then President Nixon, one floor below the President's suite. The defendant was drunk at the time, and was talking very loudly and saying that Nixon "would never become President," and a moment later said again that he was going to kill the President. *See United States v. Compton*, 428 F.2d 18 (2d Cir. 1970).

■ Count II of the indictment also stands in stark contrast with the above two examples. When read together with Count I, Count II seems to continue to evince the defendant's wish that someone else besides her should murder the President. More specifically, Count II alleges that the defendant made a statement of regret that a named second party was not more successful in an actual attempt on the life of the President. The second sentence contained in Count II does not flow coherently from the first, but can be reasonably interpreted in conjunction with the first sentence as an expression of the defendant's bravado that she would have been more successful than the second party named *if* she were to *ever* try to kill the President. This reading would render the statement contained in Count II as conditional as that contained in Count I. While in its own right, the second sentence in Count II could be read as a direct threat against the President, the context within which it was spoken would militate against this statement being interpreted as expressing such an intention. First, it is reasonable to surmise that defendant was in an agitated mood due to the fact that she had just been arraigned and placed in jail for allegedly threatening the life of the

President. And second, no other facts have been presented to suggest that this statement is anything more than the hyperbole of an angry and caustic individual. Such statements may be unpleasant and unsettling to hear, but without more, the government has failed as a matter of law to adequately plead that they would additionally amount to a serious threat against the President in violation of Section 871.

In conclusion, the defendant's motion to dismiss the indictment against defendant Mary Frances Carrier is granted.

IT IS SO ORDERED.